RECEIPT #
AMOUNT $
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

**04 1039 8 RCL**

|   |   |   |
|---|---|---|
| **BEST DOCTORS, INC.** | : | |
| | : | |
| Plaintiff, | : | **DOCKET NO.** _____ |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| **LIFE CHANGE ASSOCIATES, INC.** | : | **COMPLAINT** |
| | : | |
| Defendant. | : | **MAGISTRATE JUDGE** _____ |
| | : | |

Plaintiff Best Doctors, Inc., with its principal place of business at 101 Arch Street,

Summer Exchange Building, Suite 500, Boston, MA, 02110, by way of Complaint against

Defendant Life Change Associates, Inc., 333 Kingsley Road, Burnt Hills, NY 12027, says:

## INTRODUCTION

1.      Plaintiff Best Doctors, Inc. periodically surveys tens of thousands of physicians --

at a cost of over $1 million per survey -- to determine who those physicians consider to be the

most outstanding practitioners within their respective fields of practice.  This survey is conducted

using a proprietary polling methodology, customized software, and specially-trained researchers.

The results of the survey are maintained in Plaintiff's database and are used to further Plaintiff's

mission of connecting consumers suffering from serious illness or injury with providers of

outstanding medical care.

2.      Plaintiff operates its business using the trade name Best Doctors, Inc., and has

obtained multiple federal trademark registrations for the trademarks BEST DOCTORS and THE

BEST DOCTORS IN AMERICA, and a variety of related marks, as well as similar registrations

in countries around the world, for use in connection with a variety of goods and services.

3.     Plaintiff makes commercial use of the information contained in its database in a variety of ways.  For instance, in an effort to promote its business as well as those physicians who have been selected as BEST DOCTORS, Plaintiff periodically publishes directories of outstanding physicians organized according to geographic area and practice specialty.  Plaintiff also regularly licenses excerpts of its BEST DOCTORS database to magazines and newspapers across the country that wish to report on outstanding local physicians.  Pursuant to these license agreements, magazines and newspapers publish articles accompanied by excerpts from the BEST DOCTORS database for a particular region, specialty area or other criteria.  The published articles prominently display Plaintiff's federally-registered trademarks, BEST DOCTORS and THE BEST DOCTORS IN AMERICA.

4.     Plaintiff also operates a physician-locator service in connection with the BEST DOCTORS trademark.  Typically, Plaintiff receives a request from a consumer to be referred to a physician specializing in diagnosing and/or treating a specific medical condition; Plaintiff then provides consumer with the names, contact information, and other details concerning suitable physicians and, in many cases, Plaintiff arranges directly with the physician for treatment of the consumer.  Alternatively, consumers may purchase limited access to Plaintiff's BEST DOCTORS database in order to search themselves for qualified physicians.

5.     As an adjunct to its main businesses, Plaintiff offers commemorative plaques for sale to those physicians selected as BEST DOCTORS physicians.  Upon selection, Plaintiff notifies such physicians of their inclusion in the BEST DOCTORS database with a letter bearing Plaintiff's trademarks.  The letter invites each recipient to purchase a decorative, personalized plaque which notes the recipient's selection and also displays Plaintiff's federally registered trademarks.

- 2 -

6.    Sales of these plaques have generated approximately $600,000 of revenue for Plaintiff in connection with its most recent survey. Sales and licensing of Plaintiff's physician directories and physician-locator services generated millions of dollars of revenue for Plaintiff in fiscal year 2003.

7.    In late 2002, Plaintiff learned that Defendant was using the trademark BEST DOCTORS in connection with publishing a magazine, "Better Living Magazine," which contained printed directories of physicians organized according to geographic area and practice specialty, along with an on-line physician-locator service. Plaintiff's counsel sent Defendant a certified letter, demanding that Defendant cease and desist its use of the BEST DOCTORS mark in connection with such goods and services, but Defendant failed to respond to Plaintiff's demand.

8.    Plaintiff learned that Defendant had expanded its use of the BEST DOCTORS trademark and was soliciting physicians to purchase decorative plaques bearing the BEST DOCTORS mark. Plaintiff became aware of Defendant's expanded use when a third party who had received Defendant's solicitation approached Plaintiff, confused as to the source of the solicitation.

9.    Plaintiff's counsel immediately wrote Defendant a second certified letter, demanding that Defendant cease and desist all use of Plaintiff's registered trademark in conjunction with physician directories, decorative plaques, and related services.

10.    Defendant's Web site at <betterlivingmagazine.com> fails to state or otherwise indicate that Defendant is unaffiliated with Plaintiff.

11.    Notwithstanding Plaintiff's requests to cease and desist, Defendant has continued to engaged in its unlawful conduct despite actual knowledge of Plaintiff's sale of similar goods

and services, and of the registered status of Plaintiff's trademarks. Defendant's conduct threatens to cause confusion among general consumers and among doctors selected by Plaintiff as BEST DOCTORS physicians, and also to interfere with Plaintiff's prospective customer relationships. Plaintiff brings this action under the Lanham Act and state law to recover, inter alia, treble damages, punitive damages, attorneys' fees, and an injunction prohibiting Defendant from continuing its illegal and infringing conduct.

## PARTIES

12.    Plaintiff Best Doctors, Inc. is a Massachusetts corporation with its principal place of business at 101 Arch Street, Summer Exchange Building, Suite 500, Boston, MA 02110.

13.    Defendant Life Change Associates, Inc. is a New York corporation with its principal place of business at 333 Kingsley Road, Burnt Hills, NY 12027

## JURISDICTION AND VENUE

14.    This case arises under the trademark laws of the United States, 15 U.S.C. § 1051 et seq. The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1338(a).

15.    Plaintiff's state law unfair competition claim is joined with a substantial and related claim under the trademark laws of the United States, and, thus, the Court has jurisdiction over that claim pursuant to 28 U.S.C. § 1338(b).

16.    Plaintiff's common law claims are closely related to its claim under the trademark laws and form part of the same case or controversy as those federal claims. The Court thus has jurisdiction over Plaintiff's common law claims pursuant to 28 U.S.C. § 1367.

17.    The Court also possesses jurisdiction over this case due to the amount in controversy and the diverse citizenship of the parties, pursuant to 28 U.S.C. § 1332(a)(1).

18.    A substantial part of the events giving rise to the claims described herein occurred in this District. Venue is thus proper in this District pursuant to 28 U.S.C. § 1391.

## FACTS

### The Business of Best Doctors, Inc.

19.    The business of Plaintiff is to connect consumers suffering from serious illness or injury with outstanding medical care.  Plaintiff performs this service by publishing physician directories and by providing physician-locator services, medical second opinions, referrals to expert specialists, care management and financial administration.  The BEST DOCTORS services typically are provided as a benefit to programs of insurance, as an employee benefit, or as an individual or affinity membership program.

20.    Plaintiff has had substantial success in promoting its brand and services on a global basis.  Plaintiff's clients in the United States include Pepsi Bottling Company, Merrill Lynch, Aegon, Philip Morris, MetLife, American Reinsurance, and Blue Shield, as well as numerous other insurers, affinity groups, and thousands of individual subscribers.

21.    Internationally, Plaintiff provides its services to approximately 150 clients, including major international insurers and re-insurers, banks, employers, and governments in the following countries: Canada, the United Kingdom, Ireland, Italy, Spain, France, Portugal, Belgium, Greece, Austria, Germany, Kuwait, the United Arab Emirates, Saudi Arabia, Japan, Venezuela, Colombia, Ecuador, Peru, Chile, Argentina, Brazil, Uruguay, Mexico, El Salvador and the Dominican Republic.  These clients include AIG, Aon, BUPA, Canada Life, General Electric, Manulife, Marsh & McLennan, Munich Re, Skandia, Transamerica, Unum, and Winterthur.  Overall, Plaintiff's services are made available directly and through its clients to more than 8 million people worldwide.

22.    In support of these clients and covered individuals, Plaintiff owns subsidiary companies and/or maintains operational infrastructure in Argentina, Austria, Canada, Colombia,

Ecuador, France, Greece, Japan, Portugal, Spain, the United Arab Emirates, the United Kingdom, and Uruguay.

23.    Plaintiff has developed or initiated the development of a proprietary BEST DOCTORS database of physicians in each of the countries in which it has customers, as well as dozens of other countries around the world.

**Plaintiff's BEST DOCTORS Database**

24.    The BEST DOCTORS brand and database are critical features of the services offered by Plaintiff. The process of compiling the database is as follows.

25.    Since 1992, Plaintiff and its predecessor have actively and continuously collected data from doctors to determine which doctors they consider to be the best in their field of practice. Every two years, Plaintiff undertakes a comprehensive poll of the approximately 30,000 physicians previously selected by Plaintiff, as well as approximately 10,000 additional physicians who meet specific criteria for voting.

26.    In the polling process, Plaintiff sends out approximately 40,000 ballots to these physicians. The ballots are accompanied by a cover letter from Plaintiff that describes the process employed by Plaintiff in the compilation of the database and also provides examples of the extensive media coverage and acclaim received by Plaintiff and the BEST DOCTORS database in the period since the last poll.

27.    The letter asks the physicians surveyed to provide, on a strictly confidential basis, clinical-ability assessments of the physicians listed on the ballots. Plaintiff provides to each physician a set of standardized evaluation criteria, as well as the opportunity to provide specific commentary on individual physicians' clinical/research orientation, bedside manner, surgical skill, or other relevant criteria.

28.     Each ballot contains a list of physicians in the voter's specialty area. Each of the physicians appearing on the ballot has either been elected as a BEST DOCTORS physician in a prior poll, or has been nominated for consideration in the current poll. Depending on the specialty area, a ballot may contain as few as two dozen names or more than one hundred names.

29.     In the 2003-2004 polling cycle, Plaintiff has enjoyed a very high response rate from the physicians surveyed, capturing more than one million clinical ability assessments.

30.     The raw data obtained through the poll is entered into proprietary polling software developed for the collection of the data on each ballot. Once the raw polling has been entered into polling software, the data is processed through automated analytical software that is proprietary to Plaintiff. The result of that analysis is then subjected to detailed analysis by specially-trained researchers.

31.     Plaintiff's proprietary analytical software performs a number of operations, including providing an aggregate score for each physician that also takes into account, among other things, (a) the source of the votes received, (b) the number of votes received, (c) the geographical spread of the votes, (d) the nature and extent of comments received, (e) the comparative results for other physicians in the same specialty area and/or geographical factors in terms of each of the above criteria, and (f) other statistical factors.

32.     The computerized analysis of the voting data yields a preliminary set of physicians who have met the initial criteria to be elected as BEST DOCTORS physicians. Plaintiff then purchases or otherwise accesses a variety of resources to determine whether the doctors appearing on the list have been subjected to any disciplinary action or malpractice litigation or other related matters. Any such issues are referred to Plaintiff's medical research

team, which determines whether the facts of the case warrant an exclusion from the BEST DOCTORS database.

33.     Plaintiff also purchases or otherwise accesses state licensing and certification data, and the research team analyzes the list of names to determine if the doctors meet the licensing and certification requirements of the jurisdictions in which they practice medicine.

34.     The result of each step in the analysis is recorded in the physician's electronic record in the analytical software. The results of this analysis are compiled and then copied into Plaintiff's BEST DOCTORS database, which includes more than 30,000 doctors -- or about 5% of all doctors nationwide -- in 40 medical specialties and 430 medical subspecialties.

35.     Criteria outside of those described above are not considered in the decision to include physicians in the BEST DOCTORS database. Inclusion in the BEST DOCTORS database cannot be purchased or otherwise obtained other than through this rigorous polling and analytical process.

36.     At the end of the polling and analytical process, Plaintiff sends a letter to each of the physicians elected, informing them of their inclusion in the database. The letter prominently displays Plaintiff's trademarks, including the BEST DOCTORS mark.

37.     The letter asks each doctor to provide to Plaintiff additional detailed information about his/her practice, experience, education and other issues. Plaintiff's research staff collects this data via fax, phone calls, and e-mail. The result is a robust and unique set of information about each physician included in the database, including areas of sub-specialization, the areas of research the physician is involved in, recent publications, the types of procedures the physician has the most experience with, the diagnoses the physician considers him/herself to be most expert in, as well as other specific information about the physician's practice, including the

amount of time he/she spends seeing patients, the languages spoken in the office, whether the doctor will receive new patients, and many other pieces of information.

38.    Plaintiff spends over $1 million annually to conduct the survey, analyze and compile the results, and maintain its database.

## Plaintiff's Protected Trademarks

39.    Plaintiff maintains a very active effort in the U.S. and abroad to obtain registration of its trademarks and to protect those marks against infringement.

40.    Plaintiff owns multiple U.S. registrations and pending applications for its BEST DOCTORS mark, alone and in combination with a logo and/or a slogan.

41.    Plaintiff's THE BEST DOCTORS IN AMERICA mark was first registered in the United States Patent and Trademark Office (PTO) on the Supplemental Register in January, 1995, for use in connection with Plaintiff's printed directories of doctors and with Plaintiff's physician referral services (Reg. No. 1,876,131).

42.    Plaintiff then received a registration on the Principal Register for its THE BEST DOCTORS IN AMERICA mark (Reg. No. 2,162,196), also for use in connection with printed directories of doctors and physician referral services, in June, 1998.

43.    Plaintiff subsequently has received the following three registrations, all on the Principal Register, for its BEST DOCTORS mark:

BEST DOCTORS, Reg. No. 2,218,424, for physician referral services (January, 1999);

BEST DOCTORS and Star-in-Cross Logo, Reg. No. 2,638,047, for physician referral services, the provision of health care and health-related information, and consulting in the fields of health care and medicine (October, 2002);

BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST and Star-in-Cross Logo, Reg. No. 2,655,393, also for physician referral services, the

provision of health care and health-related information, and consulting in the
fields of health care and medicine (December, 2002).

44.    Plaintiff also owns a pending federal trademark application (Serial No.

78/352,700) for BEST DOCTORS for use in connection with decorative plaques.

45.    Plaintiff has also applied for registration of these trademarks in several foreign

jurisdictions, including the European Union, Canada, Brazil, Chile, Japan, Saudi Arabia, and the

United Arab Emirates.

### The Development, Recognition and Promotion of the BEST DOCTORS Trademark

46.    In 1992, Plaintiff's predecessor published the first edition of a hardcover volume

entitled *The Best Doctors In America* for consumers' use in identifying and locating specialist

physicians.

47.    The development of BEST DOCTORS database has been accompanied by the

development of a range of services related to the database that help people who are faced with a

serious illness.

48.    Beginning in the mid-1990s, the services of Plaintiff and the BEST DOCTORS

database began to receive prominent media attention, including, for example, a *USA Today* cover

story in October, 1997.

49.    In 1998, Plaintiff was the subject of a highly-rated segment on the CBS program

*60 Minutes*.  In a lengthy segment, journalist Morley Safer provided an in-depth profile of the

services provided by Plaintiff and the stories of individuals who had been helped by Plaintiff.

50.    Plaintiff's services have also been featured on NBC's *The Today Show,* CNN

*Headline News*, and in *The New York Times, The Los Angeles Times* and the *Wall Street Journal*.

51.    The credibility and integrity of Plaintiff, the BEST DOCTORS trademark, and the

BEST DOCTORS database are vital to the process by which the BEST DOCTORS database is

- 10 -

compiled. As highlighted in the *60 Minutes* segment, Plaintiff is completely independent, and does not take fees from physicians or otherwise compensate physicians for participating in the polling process. Plaintiff believes it is the integrity of the process by which Plaintiff compiles its database that enables Plaintiff to enjoy such strong responses from physicians in each polling cycle.

52.     Plaintiff promotes the BEST DOCTORS database and methodology by permitting media outlets across the country to license excerpts from the BEST DOCTORS database for inclusion in their publications. Typically, these publications wish to publish articles recognizing local physicians included in the BEST DOCTORS database. Each such media outlet enters into a written license agreement with Plaintiff

53.     The license agreement requires the publication to include a statement of trademark ownership along with the article and published excerpts. The statement reads:

> BEST DOCTORS, THE BEST DOCTORS IN AMERICA and the BEST
> DOCTORS logo are registered trademarks of Best Doctors, Inc. and are used
> under license.

54.     The license agreement further requires the publication to ensure that where it references the trademarks BEST DOCTORS or THE BEST DOCTORS IN AMERICA, or the BEST DOCTORS logo, each mark must appear with trademark indicia indicating its registered status.

55.     The license agreement also requires each publication to provide Plaintiff, free of charge, an advertisement of between one-quarter page and a full page that Plaintiff uses to promote the BEST DOCTORS brand.

56.     Typically, the publication affords Plaintiff front-cover treatment, and in all cases the publication provides a detailed description of the BEST DOCTORS database and methodology, along with Plaintiff's trademark notices.

- 11 -

57.    Plaintiff estimates that the total average circulation of the publications with which Plaintiff has entered into license agreements is approximately 2 million copies. Advertising rates for each magazine vary by location, but it is estimated that the combined value of (i) the advertising obtained in those publications, (ii) the prominent front-page treatment afforded by many of the publications to Plaintiff, (iii) the dozens of articles about Plaintiff and the BEST DOCTORS database printed in the publications, and (iv) the staff time dedicated to the promotion of the BEST DOCTORS brand through these license agreements, approaches $1 million in connection with the most recent survey.

58.    Plaintiff's annual direct expenditures on trademark-related activities exceed $250,000. This includes legal fees in the United States and abroad, filing fees, overhead expenses and an allocation for the staff time of Plaintiff's and its subsidiary entities and operations globally involved in compiling, reviewing, purchasing and distributing the information required for each filing, as well as tracking down potentially infringing activities in the 25 countries in which Plaintiff does business.

## Plaintiff's Sale of Commemorative Plaques

59.    Plaintiff has found that physicians elected as BEST DOCTORS physicians consider that selection to be an honor. Plaintiff has further found that many of the BEST DOCTORS physicians wish to note their election publicly to patients and others as a demonstration of their recognized expertise. The predecessor to Plaintiff began selling commemorative plaques to BEST DOCTORS physicians in 1995, and found that there was a significant market for such plaques for display in the office or at home or elsewhere. Plaintiff has continued and expanded this practice.

60.    Along with the letter Plaintiff sends to the physicians included in the database informing them of their selection, Plaintiff includes a short solicitation form. The form offers the

physician the opportunity to purchase a personalized plaque that bears the physician's name in a decorative font, along with a statement that the physician has been selected by his peers as one of THE BEST DOCTORS IN AMERICA. The plaque displays Plaintiff's marks, THE BEST DOCTORS IN AMERICA and BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST, together with Plaintiff's Star-and-Cross logo.

61.    The price for each plaque is $200. Plaques are purchased by sending in an order form to Plaintiff with a check or credit card number, by calling over the phone, or via a secured internet site. After receiving an order, Plaintiff has the plaque custom-made by a specialized producer of plaques, assembles the finished order, and ships the plaque via express mail to the physician.

62.    Plaintiff has generated approximately $600,000 in revenues from its sale of these plaques in connection with its most recent survey.

**Defendant's Unlawful Infringement of Plaintiff's Marks**

63.    In late 2002, Plaintiff learned that Defendant was publishing physician directories and providing physician-referral services under the trademarks BEST DOCTORS, BETTERLIVING'S BEST DOCTORS, and BETTERLIVING'S BEST DOCTORS ONLINE. See Exhibit A, copies of materials from Defendant's Web site at <betterlivingmagazine.com>.

64.    On November 1, 2002, counsel for Plaintiff sent a certified letter to Defendant, notifying it of Plaintiff's trademark rights and demanding that Defendant cease and desist its use of BEST DOCTORS or any substantially similar trademark in conjunction with these goods and services. Defendant failed to respond to Plaintiff's letter. See Exhibit B, Plaintiff's letter of November 1, 2002.

65.    On January 8, 2004, Plaintiff was contacted by a third party who had received materials from Defendant soliciting him to purchase a "'Best Doctors' 2004 plaque." The third

- 13 -

party wrongly believed that the materials had originated from Plaintiff. <u>See</u> Exhibit C, Defendant's plaque solicitation.

66.    Plaintiff's counsel again wrote Defendant, informing them that actual confusion had occurred and demanding that Defendant cease and desist all use of BEST DOCTORS as a trademark for physician directories and physician-referral services, decorative plaques, and related services. <u>See</u> Exhibit D, Plaintiff's letter of January 15, 2004.

67.    Defendant's counsel responded on February 6, 2004, acknowledging Defendant's use of the BETTERLIVING'S BEST DOCTORS trademark on physician directories and plaques but refusing to discontinue such use. <u>See</u> Exhibit E, Defendant's letter of February 6, 2004.

68.    As noted above, at least one third party has experienced actual confusion as to the source of Defendant's physician directories and decorative plaques, believing them to be offered by Plaintiff.

69.    Unlike Plaintiff's practices with its BEST DOCTORS physician directories and database, Defendant charges physicians a fee in exchange for being listed as a BETTERLIVING'S BEST DOCTORS physician. There is no indication that Defendant performs any substantive review or quality control over such paid listings.

70.    By offering its inferior goods and services in conjunction with Plaintiff's registered trademark, Defendant has both blurred and tarnished the high-quality image Plaintiff has spent millions of dollars to develop with physicians and the general public.

71.    Defendant's conduct has created actual confusion and will continue to create a likelihood of confusion among those doctors selected by Plaintiff for inclusion in the BEST DOCTORS database, and also among general consumers shopping for physician directories and physician-locator services. Defendant's conduct has harmed and will continue to harm Plaintiff's

reputation and goodwill, and has caused the loss of sales and profits Plaintiff would have made but for Defendant's illegal acts.

**COUNT ONE**
**(Trademark Infringement Under the Lanham Act, 15 U.S.C. § 1114)**

72.    The allegations set forth in paragraphs 1 through 71 are incorporated by reference.

73.    Continuously and since at least as early as 1992, Plaintiff or its predecessor in interest has owned the trademarks BEST DOCTORS and THE BEST DOCTORS IN AMERICA, and subsequently has owned the marks BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST and Star-in-Cross Logo.

74.    As noted above, the trademarks BEST DOCTORS, THE BEST DOCTORS IN AMERICA, and BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST and Star-in-Cross Logo, are registered with the U.S. Patent and Trademark Office on the Principal Register.

75.    Continuously and since at least as early as March, 1992, Plaintiff or its predecessor has used the trademarks BEST DOCTORS and THE BEST DOCTORS IN AMERICA, and subsequently has used the mark BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST and Star-and-Cross Logo, to identify its products and services and to distinguish them from those offered by others.

76.    Plaintiff has prominently displayed its marks in connection with its physician database, on its Web site, in publications setting forth excerpts of its list of BEST DOCTORS physicians, and in materials promoting its BEST DOCTORS physician-referral service and decorative plaques. Plaintiff's marks are displayed in conjunction with the goods and services at issue here.

- 15 -

77.    As a result of this lengthy and widespread use, Plaintiff's BEST DOCTORS, THE BEST DOCTORS IN AMERICA and BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST and Star-in-Cross Logo marks have acquired secondary meaning and distinctiveness.

78.    Defendant has infringed Plaintiff's marks in interstate commerce by selling and offering for sale goods and services highly similar to those offered for sale by Plaintiff, all while using the trademarks BEST DOCTORS, BETTERLIVING'S BEST DOCTORS, and BETTERLIVING'S BEST DOCTORS ONLINE to promote such goods and services. The use of these trademarks by Defendant is without permission or authorization of Plaintiff. Use of the phrases by Defendant has caused actual confusion and mistake and has deceived. Defendant's use of the phrases will continue to cause confusion and mistake and to deceive, as evidenced by:

(i)    the identical nature and/or extreme similarity of Plaintiff's protected marks and Defendant's infringing marks;

(ii)    the strength of Plaintiff's federally-registered marks;

(iii)    the fact that actual confusion has resulted from Defendant's use of the infringing marks, and that an extremely high likelihood of further confusion exists; and

(iv)    Defendant's bad faith in continuing to use its infringing marks, despite its knowledge of the registered status of Plaintiff's marks and the fact that Plaintiff had asked it to stop such usage.

79.    Defendant's acts of trademark infringement have been committed with the intent to cause confusion and mistake, and to deceive.

80.    At all material times, Plaintiff has displayed its marks with a symbol or symbols giving notice that its marks are registered with the PTO, and articles which appear in newspapers

and periodicals and which display Plaintiff's marks consistently display the trademark indicia
and notice quoted above.

81.    Plaintiff has repeatedly requested that Defendant cease and desist from its acts of
trademark infringement and has given Defendant actual notice of the fact that Plaintiff's marks
are registered and that Defendant's acts have caused confusion.  Defendant has nonetheless
refused to cease its infringement.

82.    Defendant has infringed on Plaintiff's marks as alleged herein with the intent to
deceive the public into believing the goods and services sold by Defendant are provided by,
approved by, sponsored by or affiliated with Plaintiff.

## COUNT TWO
### (Unfair Competition Under the Lanham Act, 15 U.S.C. § 1125(a))

83.    The allegations set forth in paragraphs 1 though 82 are incorporated by reference.

84.    Defendant's conduct in using its infringing mark has caused confusion and
mistake and has deceived, and will continue to do so.

85.    Defendant's acts of trademark infringement have been committed with the intent
to cause confusion and mistake, and to deceive.

86.    Defendant has unfairly competed with Plaintiff as alleged herein with the intent to
deceive the public into believing the services offered by Defendant are provided by, approved
by, sponsored by or affiliated with Plaintiff.

## COUNT THREE
### (Trademark Dilution Under the Lanham Act, 15 U.S.C. § 1125(c))

87.    The allegations set forth in paragraphs 1 through 86 are incorporated by reference.

88.    Plaintiff's marks BEST DOCTORS and THE BEST DOCTORS IN AMERICA
are distinctive and famous marks.  As detailed above, these marks have acquired distinctiveness,
have long been used in connection with Plaintiff's goods and services, have long been used in

- 17 -

extensive advertising and promotion throughout the United States and internationally, are in substantially exclusive use, and are federally registered.

89.    Defendant has made commercial use of the marks owned by Plaintiff in connection with services which Defendant has offered for sale and sold in United States interstate commerce.

90.    Defendant's unlawful acts were commenced and committed from a time after Plaintiff's marks became famous.

91.    Defendant's acts are in violation of § 43(c) of the Lanham Act in that such acts have caused dilution of the distinctive quality of Plaintiff's famous marks, BEST DOCTORS and THE BEST DOCTORS IN AMERICA, thus causing irreparable injury and damage to Plaintiff.

92.    Defendant's acts have lessened the capacity of Plaintiff's famous marks to identify and distinguish the goods and services of Plaintiff. Defendant's acts have blurred the unique association which exists between Plaintiff's marks and Plaintiff's goods and services.

93.    Defendant's conduct has tarnished the image of high quality and integrity which Plaintiff has spent millions of dollars to develop in connection with its marks.

94.    Defendant committed these acts willfully and with the intent to trade on the reputation of Plaintiff and to cause dilution of Plaintiff's famous marks.

## COUNT FOUR
### (Violation of Massachusetts Unfair Competition Law, Mass. G.L. c. 93A)

95.    The allegations set forth in paragraphs 1 through 94 are incorporated by reference.

96.    At all relevant times, Plaintiff and Defendants have been engaged in the conduct of trade and commerce in the Commonwealth of Massachusetts, and Defendant's actions constituting unfair competition took place primarily and substantially in the Commonwealth of Massachusetts.

97.     By their conduct as set forth above, Defendants have willfully or knowingly engaged in unfair and deceptive acts and practices in violation of G.L. c. 93A, §§ 2 and 11.

98.     Defendant has unfairly competed with Plaintiff as alleged herein with the intent to deceive the public into believing the services sold and offered for sale by Defendant are provided by, approved by, sponsored by or affiliated with Plaintiff.

99.     As a result, Plaintiff has suffered harm and damages for which Defendant is liable.

## COUNT FIVE
### (Tortious Interference With Prospective Economic Advantage)

100.    The allegations set forth in paragraphs 1 through 99 are incorporated by reference.

101.    Plaintiff has had and will continue to have a reasonable expectation of economic advantage with respect to sales of its physician directories, physician-referral services, and decorative plaques to consumers and to physicians.

102.    Defendant has interfered intentionally and with malice with Plaintiff's prospective economic advantage, as described above.

103.    Defendant's interference has proximately caused the loss of Plaintiff's prospective gain.

## COUNT SIX
### (Conversion)

104.    The allegations set forth in paragraphs 1 through 103 are incorporated by reference.

105.    Plaintiff has had the right to immediate possession of these marks.

106.    Defendant has wrongfully, intentionally and in bad faith interfered with Plaintiff's right, as described above.

107.    Plaintiff has been damaged as a proximate result of such interference.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant on all Counts for (1) a permanent injunction enjoining and restraining Defendant and its agents from (a) directly or indirectly using the terms BEST DOCTORS, BETTERLIVING'S BEST DOCTORS, or BETTERLIVING'S BEST DOCTORS ONLINE, or any other mark, word, or name similar to Plaintiff's marks which is likely to cause confusion or mistake or to deceive; (b) offering physician directories, physician-referral services, and decorative plaques for sale to third parties in conjunction with Plaintiff's trademarks or any confusingly similar trademark; (c) ordering Defendant to destroy all materials bearing the mark BEST DOCTORS or any similar mark, word or name; (3) damages; (4) treble damages on Plaintiff's claims under the Lanham Act and the Massachusetts unfair competition statute; (5) attorneys' fees on Plaintiff's claims under the Lanham Act and the Massachusetts unfair competition statute; (6) punitive damages on Plaintiff's state common law claims; (7) interest; (8) costs; and (9) such other and further relief as the Court deems just and proper.

By: _____

Sean Ploen, Esq. (BBO # 641279)
BOSTON LAW GROUP, LLP
20 Park Plaza, Suite 637
Boston, MA 02116
Tel. (617) 426-6800
Attorney for Plaintiff

Dated:  February 27, 2004